UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ARTHUR S. MANN,

        Petitioner,        Case Number: 02-10233-BC
                                              Honorable David M. Lawson

v.

KURT JONES,

        Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Arthur S. Mann, a Michigan prisoner currently confined at the Thumb Correctional Facility in Lapeer, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that he is incarcerated in violation of his constitutional rights. The petitioner was convicted of conspiracy to commit first-degree murder, Mich. Comp. Laws §§ 750.157a, 750.316, and solicitation of first-degree murder, Mich. Comp. Laws §§ 750.157b, 750.316, following a jury trial in the Macomb County, Michigan circuit court in 1997. He was sentenced to concurrent terms of life imprisonment without parole and life imprisonment with the possibility of parole, respectively, on those convictions in 1998. In his pleadings, the petitioner argues that evidence surrounding the victim's murder should not have been admitted because he was not on trial for the murder itself; the prosecutor and police engaged in misconduct; and he is entitled to habeas relief based on the cumulative effect of all errors at trial. The respondent contends that the petitioner's claims lack merit and should be denied. The Court concludes that the petitioner's grounds for relief are without merit and the petition for a writ of habeas corpus must be denied.

I.

The petitioner's convictions stem from his solicitation of, and conspiracy to commit, the murder of his brother-in-law and business partner, David Bartmess, in Shelby Township, Michigan.

Bartmess actually was killed: he was shot five times at close range on the morning of February 7, 1994 at the May Day Temporary Labor Services in Rochester Hills, Michigan and died at the hospital later that day. However, there was scant evidence at trial that the petitioner had a hand in the actual killing. Rather, the proofs focused on the petitioner's solicitation of *another* individual to kill Bartmess. That person never did commit the murder. The petitioner was charged with solicitation of murder and conspiracy to commit murder in Macomb County, and he was charged separately with the murder of Bartmess in Oakland County, but the trial court denied the petitioner's motion for joinder. It appears that the murder charge in Oakland County eventually was dismissed. The petitioner argues that evidence of the actual killing, therefore, should not have been allowed at trial.

At trial, the prosecution presented a number of witnesses who described the circumstances of Bartmess's death. An emergency room physician testified that Bartmess suffered five gunshot wounds to the head and was pronounced dead on the morning of February 7, 1994. The pathologist who conducted an autopsy of the victim explained that all of the gunshots were fired at close range or while the gun was in contact with the skin. Photographs and videotape of the murder scene were also admitted into evidence.

Mary Billel, the wife of one of Bartmess's business partners, described the layout of the offices at the May Day Temporary Labor Services and stated that she last saw Bartmess there at 6:30 a.m. on the morning of the shooting. She said that several temporary workers were also there when she arrived. One of the temporary workers testified that by the time he left May Day at around 7:15 a.m., no one was there except Bartmess. Another worker testified that he saw a suspicious car in the May Day parking lot with the engine running and a man in the driver's seat that morning at about 6:35 a.m. Another worker testified that he noticed a silver or gray car with two occupants parked

by the Dumpster in the parking lot a little after 7:00 a.m.; the people in the car were slouched down low in their seats.

One person at a nearby restaurant testified that he saw a suspicious-looking gray or silver car with a person slouching down in the driver's seat parked in front of the Dumpster in the parking lot at about 7:00 a.m. on the morning of the shooting. Another patron of the restaurant testified that he saw a suspicious silver or gray car in the parking lot between 7:00 and 7:30. The car moved closer to May Day and parked, then two white males got out of the car and walked toward May Day. A few minutes later the men returned to the car and turned left out of the parking lot into traffic, forcing the traffic to stop.

Temporary worker Robert DeVos testified that he found Bartmess after the shooting at about 7:30 a.m. and called 911. He described the injuries on Bartmess's head and said that he heard Batmess moaning and gurgling. He acknowledged that Bartmess was a "smart ass" who sometimes upset employees and stated that he had heard workers threaten Bartmess. Emergency medical technician Michael Myers, who responded to the 911 call, described the wounds he observed on Bartmess and the condition of the crime scene, including the locations of shell casings he saw in the building. Several police officers also discussed their investigation of the crime scene.

The prosecution next presented several witnesses to explain the petitioner's motive for seeking Bartmess's murder. Larry Cooper, Bartmess's friend and business associate, testified that he and Bartmess had been partners and later, along with the petitioner, competitors in the temporary labor industry. He explained how such businesses operated and described business insurance practices. Rosario Pacis, a manager of the Michigan Employment Security Commission ("MESC") tax office, described the manner in which businesses were required to report taxable wages paid to employees. She also testified about documents submitted by the petitioner's company, Total Temporary Services. James Cook, an auditor for Michigan Mutual Insurance Company (also known

-3-

as Amerisure), testified about documents submitted by accountant Joe Gurin on behalf of Total Temporary Services. He concluded that if he had been provided the same figures as those submitted to the MESC, he would have charged Total Temporary Services a much higher insurance premium.

The preliminary examination testimony of accountant Joe Gurin, who died before trial, was also admitted into evidence. Gurin had been granted immunity for his testimony. Gurin stated that he had worked for the petitioner, Bartmess, and Cooper for many years and explained that all three had argued about money. Gurin testified that the petitioner had told him that he could not stay in business if he had to pay Gurin's projected insurance premiums. As a result, Gurin filed false documents to reduce the insurance premiums for the petitioner's business. Gurin believed that Bartmess also filed false documents. Gurin never heard the petitioner threaten Bartmess.

Attorney David Bisgrove testified that he represented Bartmess in a lawsuit against the petitioner in 1983, when the petitioner was Bartmess's employee. Bartmess had alleged that the petitioner had the accounts receivable of Bartmess's business put in the name of the petitioner's business although Bartmess's business was owed the money; the petitioner also had put the telephone number of his own business under the name of Bartmess's business so that people who called the number thinking that they were calling Bartmess's business would connect with the petitioner's company instead. Bartmess and the petitioner settled the case with an agreement that they would operate one business jointly, with stock owned by the two men to be held by two trustees. The petitioner would also pay Bartmess $11,000 over three years and pay Bartmess's family's health insurance premiums for three years. At the end of the three years, the stock would go to Bartmess. Bisgrove testified that he believed the agreement was extended when the three-year period expired, but he did not know the details of that arrangement. Attorney Paul Vanassche testified that he represented Bartmess in a 1992 lawsuit attempting to enforce the 1983 agreement. The dispute was settled after Bartmess was murdered.

The prosecution next presented evidence concerning the conspiracy and the solicitation of the murder. Eric Masters stated that he was testifying as part of an agreement in which he pleaded guilty to solicitation of murder with a sentence cap of 20 years' imprisonment in exchange for the dismissal of a conspiracy to commit murder charge. Masters testified that he met the petitioner at his parents' jewelry store, which was next to a store run by the petitioner's wife. Masters and the petitioner developed a friendly relationship. Masters testified that the petitioner initially asked him if he could obtain a silencer for a handgun. Masters asked his friend, Craig Sizemore, if he would help locate such an item. In the fall of 1992, the petitioner asked Masters if he could find someone to commit a murder for $25,000. The petitioner told Masters how easy it would be, discussing the subject on many occasions. The petitioner also drove Masters to possible murder sites – a temporary service business and a residential area. Masters said that he tried to persuade Demetrius Meffer to commit the murder for $1,000. Meffer responded that he need $150 to obtain a gun. Masters then told the petitioner that he had someone to do the job but needed $3,500 to give to him. According to Masters, the petitioner gave Masters $3,500 in February of 1993. Masters gave Meffer $300 but nothing more occurred. Masters admitted that he was a long-time user and supplier of cocaine and other drugs. Several witnesses confirmed that the petitioner had contact with Masters.

Craig Sizemore testified that Masters began asking him for a silencer sometime in 1991, but he never obtained one. Masters told him that the petitioner wanted the silencer.

John Kwasniewski testified that he first met Masters when they both worked on a construction crew in the summer of 1993. Masters began offering him money if he would kill someone, and Masters continued to pursue the matter all summer. Kwasniewski said that Masters was visited at the worksite several times by a man who wore summer clothes and a straw hat and drove a white Cadillac. Kwasniewski and Masters referred to him as "Cabana Man." Kwasniewski explained that Masters would leave the site to talk to the Cabana Man, and when he returned he

-5-

would urge Kwasniewski more intensely to commit the killing. Eventually, Masters provided a location and description of the man to be killed: the man worked at Temporary Service on Adams and Auburn Road, Northeast side; he was an older man with thinning hair, almost six feet tall, he wore glasses, and his name was Dave; he drove a Toyota Forerunner with "No Fear" on the window; he arrived at work at 5:30 in the morning. Masters also told Kwasniewski of a house where the intended victim lived, and added that Kwasniewski would get a bonus if he killed a woman who was with the victim. Kwasniewski identified the petitioner at trial as the Cabana Man but testified that he had never spoken to the petitioner. He noted that he had also seen the petitioner in a green Jeep. After Kwasniewski saw a newspaper article about Bartmess's shooting, he told Masters that he had done the job and wanted $7,000. Masters told Kwasniewski that he would get back to him. The next day, Masters told Kwasniewski that he would not pay because "his people had already taken care of it on their own." Trial Tr., 9/30/1997, at 42. Kwasniewski admitted at trial that he had abused alcohol and drugs in the past.

Police officers testified about the execution of a search warrant at the petitioner's home during which business records and a memo book were recovered. A firearms expert testified that he tested ten different firearms but could not find a match for the bullets that killed Bartmess. Other witnesses testified about telephone records that showed contacts between Masters, the petitioner, Meffer, Sizemore, and Kwasniewski.

Oakland County Sheriff's Detective Michael Poet, one of the lead investigators, also testified at trial. He stated that he met with John Kwasniewski in May of 1994 to discuss the crime, including the possible involvement of Eric Masters and the "Cabana Man" who drove a white Cadillac and a green Jeep. Detective Poet discovered that the petitioner owned both such vehicles and then focused his investigation on Masters and the petitioner. During his testimony, Detective Poet noted that the FBI was interested in investigating the petitioner for fraud. He also mistakenly referred to

-6-

the Bureau of Alcohol, Tobacco, and Firearms ("ATF") as the "Bureau of Alcohol, Tax, and Firearms." Detective Poet admitted that he developed a romantic relationship with Bartmess's daughter, Samantha, in the fall of 1994. He married her in June of 1996 and also adopted her child prior to trial. Detective Poet mentioned that Samantha Bartmess had taken a polygraph test during the murder investigation, but he did not discuss the matter further. Samantha Bartmess allegedly was a party in a civil wrongful death action filed against the petitioner.

The only defense witness at trial was Marlene Mann, the petitioner's wife of forty-four years. She testified that she and the petitioner were at the hospital when the doctor informed them that David Bartmess's wounds were fatal.

At the close of trial, the jury found the petitioner guilty of conspiracy to commit first-degree murder and solicitation of first-degree murder. The trial court subsequently sentenced him to the concurrent life imprisonment terms noted earlier.

Following sentencing, the petitioner filed an appeal of right in the Michigan Court of Appeals raising the same claims presented in the instant petition, as well as several other claims. The Michigan Court of Appeals affirmed the petitioner's convictions and sentences. *See People v. Mann*, No. 209711, 2000 WL 33403215 (Mich. Ct. App. Oct. 27, 2000) (per curiam, unpublished). The petitioner filed an application for leave to appeal in the Michigan Supreme Court, which was denied. *See People v. Mann*, 465 Mich. 855, 633 N.W.2d 143 (2001).

The petitioner, through counsel, then filed the present petition for a writ of habeas corpus raising the following claims:

    A.    The petitioner was denied his Fourteenth Amendment due process right to a fair trial by the admission of voluminous and gruesome yet irrelevant evidence of the killing of David Bartmess, despite the lack of sufficient evidence that the petitioner or the individuals he was alleged to have conspired with and solicited had any connection to the homicide.

    B.    The petitioner was denied his due process right to a fair trial by repeated instances of police and prosecutorial misconduct, including the prosecutor's expression of his personal belief that the petitioner was guilty, the prosecutor personally addressing the jurors despite the trial court's ruling that such conduct was impermissible, and the intentional injection of non-responsive and highly prejudicial testimony by the officer in charge, who had a monetary and personal interest in the outcome of the trial.

    C.    The petitioner was denied his due process right to a fair trial through the cumulative effect of trial errors.

The respondent filed an answer to the petition asserting that it should be denied for lack of merit.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

> As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases: An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000); internal quotes omitted). Additionally, this

-8-

Court must presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1) (providing that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case."  *Id.* at 409.  The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . .  Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

-9-

*Id.* at 409, 410-11. *See also King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *McAdoo v. Elo*, 365 F.3d 487, 493 (6th Cir. 2004); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

A.

The petitioner first claims that he is entitled to habeas relief because the trial court erred in admitting voluminous and gruesome evidence of David Bartmess's death. The petitioner argues that the evidence of the murder, presented over three days at the beginning of trial, was irrelevant, cumulative, and prejudicial because there was insufficient evidence to show that the petitioner was responsible for the murder. He asserts that the evidence was likely to confuse and invoke the passions of the jury. This state law evidentiary error, the petitioner argues, rose to the level of a due process violation.

The Michigan Court of Appeals found that the evidence of Bartmess's murder was admitted properly, explaining:

> Defendant first contends that the trial court abused its discretion in admitting evidence of the victim's murder. We disagree. We review a trial court's admission of evidence for an abuse of discretion. *People v. Sawyer*, 222 Mich. App 1, 5; 564 N.W.2d 62 (1997). Here, the evidence of the murder itself was highly probative of defendant's guilt. Defendant's coconspirator, Eric Masters, testified with regard to defendant's instructions on how he wanted the murder committed. The details of the murder were relevant because the manner in which the murder ultimately was carried out closely matched defendant's instructions and because it corroborated the testimony of Masters and those he solicited to commit the murder. The evidence, although prejudicial, was not unfairly prejudicial. *People v. Mills*, 450 Mich. 61, 75-76; 537 N.W.2d 909 (1995), *modified* 450 Mich. 1212 (1995), citing *Sclafani v. Peter S Cusimano, Inc.*, 130 Mich. App 728, 735-736; 344 N.W.2d 347 (1983). Moreover, any potential prejudice was cured by the trial court's repeated instructions regarding the limited purpose for which the evidence was admitted. We find no abuse of discretion.

*People v. Mann*, 2000 WL 33403215, at *1 (Mich. Ct. App. Oct. 27, 2000).

It is well established that trial court errors in the application of state procedure or evidentiary law, particularly regarding the admissibility of evidence, generally are not cognizable as grounds

for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). On habeas review, this Court is bound by the state court's interpretation of state law. *Bradshaw v. Richey*, 126 S. Ct. 602, 604 (2005). Only where admission of the disputed evidence rendered the trial "so fundamentally unfair as to deprive the petitioner of due process" does it provide grounds for granting a writ of habeas corpus. *Broom v. Mitchell*, 441 F.3d 392, 406 (6th Cir. 2006) (quoting *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004)).

This Court finds that the testimony did not render the petitioner's trial fundamentally unfair. As the state court noted, the details of the murder were relevant because the manner in which Bartmess was killed closely matched the petitioner's instructions and corroborated the testimony of key witnesses such as Eric Masters. The fact that Bartmess was killed in a manner that matched the petitioner's instructions to another, would-be assassin rendered more likely the proposition that the petitioner actually conspired to have someone kill Bartmess. Furthermore, the admission of the evidence did not deprive the petitioner of due process. In *Estelle v. McGuire*, where the petitioner was convicted of the second-degree murder of his infant daughter, the Supreme Court found that the admission of evidence indicating that the child had suffered numerous injuries in the past did not deprive the petitioner of a fundamentally fair trial, even though the evidence did not establish who had inflicted the prior injuries. 502 U.S. at 68-69 (observing, "[w]hen offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries"). In this case, the evidence of the murder is similarly relevant, even though it does not prove that the petitioner was responsible for the actual murder. Moreover, the record reveals that the trial court gave limiting instructions to the jury regarding the proper consideration of this evidence. Therefore, the admission of this evidence did not result in a fundamentally unfair trial.

The petitioner cites *United States v. Ostrowsky*, 501 F.2d 318 (7th Cir. 1974), in support of the argument that receipt of the evidence of Bartmess's killing violated the Due Process Clause. In *Ostrowsky*, the defendants were charged with concealing a stolen automobile and moving it across state lines, but the prosecutor presented extensive evidence of the murder of the car's owner to show that the defendants knew the car was stolen. *Id*. at 322. The Seventh Circuit Court of Appeals held that some evidence of the murder would have been permissible, but the government's admission of extensive evidence of the murder "transgress[ed] the bounds of necessity." *Ostrowsky*, 501 F.2d at 323. The court concluded that the trial court abused its discretion in admitting gruesome and unnecessary evidence of the murder.

*Ostrowsky* is distinguishable from the present case on several grounds, not the least of which is the procedural posture of that matter: *Ostrowsky* involved a federal criminal conviction reversed on direct review. The court did not engage in a due process analysis of the issue, which was decided on the basis of federal evidence law. On habeas review, a petitioner must show that the evidentiary error rose to the level of a due process violation. The petitioner in this case has failed to make such a showing. The petitioner, therefore, has not established that the state court's decision is contrary to or an unreasonable application of federal law.

B.

The petitioner next asserts that he was denied a fair trial due to various instances of prosecutorial and police misconduct. Prosecutorial misconduct will form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-46 (1974); *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999) (stating that "[p]rosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation"). The determination whether the trial was fundamentally unfair is "made by evaluating the totality of the circumstances surrounding each individual case." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). The Court must focus on "the fairness of the trial, not the culpability of the prosecutor." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

The Sixth Circuit has identified four factors to consider when analyzing such claims: (1) the likelihood that the statements would prejudice the defendant or mislead the jury; (2) whether the remarks were isolated or part of a pattern; (3) whether the prosecutor's statements "were deliberately or accidentally presented to the jury"; and (4) whether the other evidence against the defendant was substantial. *Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000) (citing *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994)).

The petitioner first claims that the prosecutor erred by expressing a personal belief in the petitioner's guilt. He argues that the prosecutor expressed his personal opinion that the petitioner was guilty when he stated in his closing argument:

> I am going to ask you now and I do ask you throughout to convict the defendant of the two charged crimes, conspiracy and solicitation, and I don't do that just because

> that is my job up here. I do that because people [sic] believe that is what the evidence says you should do.

Trial Tr., 10/3/1997, at 13-14. The prosecutor also stated:

> I want to tell you now that it is the People's heart felt conviction that the proofs in this case, and we're going to ask you because of the proofs in this case, to find that they show that the Defendant, Art Mann, did it, did it just as he said. He conspired and he solicited to kill David Bartmess.

*Id.* at 68. The Michigan Court of Appeals concluded that the prosecutor did not engage in misconduct because he related his belief in the petitioner's guilt to the evidence presented at trial. *See Mann*, 2000 WL 33403215 at *2. This Court finds that the state court's decision is consistent with United States Supreme Court precedent and constitutes a reasonable application of federal law.

A prosecutor generally may not convey his personal opinion regarding the defendant's guilt or the credibility of witnesses, but he may argue that the jury should reach a particular conclusion based on certain evidence. *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999). The Sixth Circuit Court of Appeals has explained:

> Courts frown upon such statements [expressing personal belief in the defendant's guilt] for two reasons: 'such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.' *United States v. Young*, 470 U.S. 1, 18, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985); *see also Caldwell*, 181 F.3d at 737 (stating that personal appeals exceed 'the legitimate advocate's role by improperly inviting the jurors to convict the defendants on a basis other than a neutral independent assessment of the record proof').

*Gall v. Parker*, 231 F.3d 265, 312 (6th Cir. 2000).

The record fails to reveal grossly improper comments by the prosecutor. Although the prosecutor unfortunately used terms like "heart felt conviction" or "I submit" in discussing the petitioner's guilt, he tied his arguments to the evidence presented at trial and reasonable inferences drawn therefrom. The petitioner's claim to the contrary is unsupported.

-14-

The petitioner also contends that the prosecutor improperly addressed individual jurors by name during closing arguments. In his closing arguments, the prosecutor addressed one member of the jury in a hypothetical solicitation to commit murder, stating:

> By the way, Mr. Huyahe, (juror, seat 3), You know, what [sic] I look at you I see the kind of guy, I really do, I see the kind of guy, I'm sure you would kill somebody for me.
>
> [Defense counsel objected to a dialogue with the juror and the judge cautioned the prosecutor against asking a question that seemed to be eliciting a response. The prosecutor continued.]
>
> Someone would kill for a few thousand dollars, clean-cut guy. You are not high. You are not on drugs or alcohol half the time, but I'm sure you would do it. I have no knowledge about you, but you know, I'm pretty sure you would do harm to other people that I want. I've never been introduced to you by anyone we have in common but I'm certain of [sic] I ask you to do me a favor you would do that not knowing me too. Maybe I'm setting you up, but you would do it without thinking about that, right? Kill this guy? He's just a pain. I've had enough of him and I'll pay you well; 5, maybe 25. It's worth a lot to me.
>
> Is anything like that ever going to happen? No, it's not. It's not. Such a discussion with people who are listening attentively; such a discussion by hopefully someone like myself who should be able to find other ways to deal with people who are a pain to me, discuss with you all of those things that I described about you, not an apparent drug user, no apparent alcohol abuser [sic], clean-cut guy, family worker, as we found out, working didn't become a problem for you. If I want somebody killed I am going to go to somebody that I'm pretty darn sure of several things, they are not going to go to the cops the second I leave and say this guy, Kaiser, asked me to kill somebody, so I want to be pretty sure of that. I want to be pretty sure that they are low enough in the social order, and if Eric Masters was sitting here, I would say the same thing, that they are low enough in the social order that they would do so.

Trial Tr., 10/3/1997, at 39-41. The prosecutor then addressed another juror, saying:

> Mr. Cole, (juror seat 6), one point in your life kissed your wife, especially you. Probably the first time, I suspect –
>
> [Defense counsel objected again and the judge directed the prosecutor to "avoid directing statements that are phrased especially in the form of a question to the jurors." The prosecutor continued:]
>
> I suspect, Mr. Cole, you don't remember anything about this second time, maybe a little. The third time you kissed your wife, the fourth, where you were home, car,

-15-

> whatever. I suspect not, but very significant events in your life, ones that you wanted to remember.
>
> The events that these witnesses were involved in were passing through their lives, nothing that they wanted to sit down and be able to say, you know, years from now I want to remember this moment. So again, as we challenge their memories, as Mr Rabaut would certainly want you to do, and which you are naturally going to do, you got to keep in mind your surroundings.

*Id*. at 43-44. The petitioner argues that these statements to the jurors constituted "an unfair attempt to develop an intimate relationship and feeling of trust." Brief in Support of Petition at 27.

The Michigan Court of Appeals found the claim abandoned due to the absence of citation to supporting authority, but alternatively concluded that the trial court's instructions that the lawyer's statements and arguments were not evidence dispelled any unfair prejudice. *See People v. Mann*, 2000 WL 33403215 at *2. Having reviewed the record, this Court finds that the state court's decision is neither contrary to nor an unreasonable application of Supreme Court precedent. The prosecutor's three references to individual jurors during arguments were not likely to prejudice the petitioner or mislead the jury. The trial court warned the prosecutor to stop addressing the jurors and instructed the jury that the attorneys' comments and arguments were not evidence. Under these circumstances, it cannot be said that the prosecutor's conduct was unduly prejudicial.

The petitioner next asserts that he was denied a fair trial by police misconduct when Detective Poet offered prejudicial and non-responsive testimony because he had personal and financial interests in the case. By the time of his testimony at trial, Detective Poet had married the victim's daughter and adopted her child, and the victim's daughter had become a plaintiff in a wrongful death suit against the petitioner. The petitioner claims that Detective Poet engaged in misconduct when he improperly used the word "tax" when defining the acronym ATF; referred to the fact that Samantha Bartmess had taken a polygraph test; stated that the FBI was interested in the petitioner; and mentioned an angry confrontation that took place between him and the petitioner's

daughter. The petitioner cites Michigan law supporting his argument that it is misconduct for a police witness to volunteer nonresponsive and prejudicial comments in trial testimony. The Michigan Court of Appeals rejected the assertion that the testimony constituted misconduct, explaining:

> We find no misconduct with respect to the investigating officer's testimony. His inadvertent and mistaken use of the word "tax" when defining the acronym ATF was not prejudicial and, therefore, does not warrant reversal. *People v. Van Dorsten,* 96 Mich. App 356, 363; 292 N.W.2d 134 (1979), *rev'd on other grounds* 409 Mich. 942 (1980). Likewise, the officer's inadvertent reference to the fact that a potential suspect had taken a polygraph examination does not constitute prejudicial error, *People v. Murry,* 108 Mich. App 679, 684; 310 N.W.2d 836 (1981); the results of the examination were never disclosed and the person who was tested did not testify as a witness at trial. Any prejudice resulting from the officer's statement that the FBI was interested in prosecuting defendant federally for insurance fraud could have been eliminated by a timely request for a curative instruction. *People v. Green,* 228 Mich. App 684, 693; 580 N.W.2d 444 (1998). We also find that the officer's testimony regarding an incident involving him and defendant's daughter was not such as to deprive defendant of a fair trial, and the court's instruction that the jury was to disregard the statement was sufficient to dispel any potential prejudice. Finally, we reject defendant's claim of error predicated on the officer's alleged conflict of interest. The officer was competent to be a witness, MRE 601, and defendant properly cross-examined him to test the truthfulness of his testimony by eliciting evidence of any fact influencing his testimony. *People v. Mumford,* 183 Mich. App 149, 152; 455 N.W.2d 51 (1990). It was up to the jury to decide how such evidence affected the officer's credibility and how much of his testimony to accept. *People v. LaPorte,* 103 Mich. App 444, 447; 303 N.W.2d 222 (1981).

*People v. Mann*, 2000 WL 33403215, at *2.

The state court's decision does not contravene or unreasonably apply Supreme Court precedent. As to the substance of Detective Poet's testimony, the Court again notes that alleged trial court errors in the application of state procedure or evidentiary law, particularly regarding the admissibility of evidence, are generally not cognizable as grounds for federal habeas relief. *See Estelle*, 502 U.S. at 67-68. Furthermore, none of the alleged improprieties was sufficiently prejudicial to warrant habeas relief from this Court. The tax and polygraph references were inadvertent and not discussed further, the FBI statements were not significantly prejudicial given

that the jury was already aware that the petitioner had filed false documents to decrease his insurance premiums, and the comment concerning the confrontation with the petitioner's daughter was stricken by the trial court. The petitioner, therefore, has failed to establish that the admission of such testimony rendered his trial fundamentally unfair.

The petitioner points to Detective Poet's alleged bias to show that the offending statements were not inadvertent, but rather deliberate attempts to prejudice the defense. However, the statements were not so prejudicial as to rise to a due process violation. Furthermore, a witness's possible bias, prejudice, or motive to lie is relevant to a jury assessment of the weight to be afforded to his testimony. *See Hoffa v. United States*, 385 U.S. 293, 311 (1966). In this case, because the jury was well aware of Detective Poet's relationship with Samantha Bartmess and his role in the criminal investigation, the jury was able to consider the context in which Detective Poet encountered the petitioner's daughter. The petitioner has not established that his due process rights were violated by Detective Poet's statements in his testimony at trial. Habeas relief is not warranted on this claim.

Finally, the petitioner was not deprived of due process as a result of the cumulative effect of prosecutorial and police misconduct. As explained above, the prosecutor's addressing individual jurors in closing arguments was not prejudicial; Detective Poets statements involving "tax" and the possibility of an FBI investigation were not overly prejudicial considering that the jury had heard evidence that the petitioner was engaging in fraudulent activities; and the Detective's statements involving Samantha Bartmess's polygraph test was not prejudicial because no other evidence was presented that she could have murdered the victim. "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). The petitioner has not been denied due process.

C.

Lastly, the petitioner asserts that he is entitled to habeas relief based upon the cumulative effect of the alleged errors at trial. The Michigan Court of Appeals rejected this claim because the petitioner had not established entitlement to relief on any of the alleged errors. *See People v. Mann*, 2000 WL 33403215, at *3. Given this Court's determination that the petitioner's claims lack merit, he cannot establish that habeas relief is warranted based upon a claim of cumulative error. *See Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006). Further, the Sixth Circuit has noted that the United States Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Therefore, the state court resolution of the cumulative error claim is neither contrary to nor an unreasonable application of Supreme Court precedent so as to warrant habeas relief.

IV.

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

                                                           s/David M. Lawson
                                                           DAVID M. LAWSON
                                                           United States District Judge

Dated: September 11, 2006

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 11, 2006.

s/Felicia Moses
Case Manager